BURKE, Judge.
John Russell Calhoun was convicted of four counts of murder made capital because it was committed during the course of a robbery, see § 13A-5-40(2), Ala.Code 1975, during the course of a burglary, see § 13A-5-40(4), Ala.Code 1975, during the course of a rape, see § 13A-5-40(3), Ala.Code 1975, and during the course of a sodomy, see § 13A-5-40(3), Ala.Code 1975. By a vote of 10-2, the jury recommended that Calhoun be sentenced to death. The trial court accepted the jury's recommendation and sentenced Calhoun to death. This Court affirmed Calhoun's convictions and sentence in Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005), and issued a certificate of judgment on December 19, 2005, following the denial of certiorari review by the Alabama Supreme Court on December 16, 2005. The United States Supreme Court denied certiorari review on June 30, 2006. Calhoun v. Alabama, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006).
On December 6, 2006, Calhoun filed a timely petition for postconviction relief pursuant to Rule 32, Ala. R.Crim. P. Calhoun amended the petition multiple times and filed the underlying petition on April 30, 2009. (C. 331-400.) In his petition, Calhoun claimed that he received ineffective assistance of counsel at various stages of the proceedings against him. The circuit court ultimately dismissed Calhoun's petition on February 4, 2015, without holding an evidentiary hearing. This appeal follows.
The facts from Calhoun's case were set forth in this Court's opinion on direct appeal:
"The State's evidence tended to show that on May 8, 1998, Calhoun entered L.P.'s [1] and Tracy Phillips's home in Talladega and shot and killed Tracy Phillips. L.P. testified that on the evening of May 8 her neighbor telephoned her to tell her that there was a man looking in the windows of her house. L.P. told her husband, Tracy, and Tracy went to check outside. When Tracy returned to the house Calhoun, who was wearing a stocking mask over his face, was following behind him with a gun. L.P. said that she knew that the man in the mask was Calhoun because he had been to their house that day and she had also seen him when she had been posting signs earlier that day for a yard sale she was having. L.P. said that she ran upstairs to one of the bedrooms to hide her daughter and her daughter's friend and locked the bedroom door behind her. Moments later, she said, Tracy yelled from behind the door that Calhoun had a gun to his head and that if she did not open the door Calhoun would kill him. She complied and Calhoun entered the bedroom. Tracy pleaded for their lives and offered him money and jewelry. Calhoun declined and told L.P. to take off her clothes, get on the bed, and spread her legs. L.P. complied. Calhoun pushed Tracy's head between his wife's legs, held the gun to the back of Tracy's head, and pulled the trigger. The coroner testified that Tracy died of a gunshot wound to the back of his head, which severed his brain stem.
"After shooting Tracy, Calhoun dragged L.P. downstairs, where he raped, sodomized, and beat her. She said that at one point she struggled with Calhoun for the gun, he became enraged, and he pointed the gun at her and pulled the trigger, but the gun did not fire. Calhoun then raped her again and told her to get any money that she *463 had upstairs. She refused to go back upstairs because her husband's body was there, but she told Calhoun that she had jewelry in a downstairs bathroom. L.P. gave him some jewelry, he threw some of it down, and he left. L.P. then telephoned emergency 911.
"A person matching Calhoun's description was seen fleeing the murder scene. Neighbors also saw Calhoun's car near the murder scene. One neighbor telephoned emergency 911. Police issued a 'BOLO' for Calhoun's vehicle. After police were unsuccessful in locating Calhoun's vehicle, Charles Hedrick, a sheriff in the Talladega County Sheriff's Department, went to the area where Calhoun's mother lived and found Calhoun's vehicle hidden in some bushes. The next morning police returned to the area and conducted an extensive search. Officer Wren Cooley of the Talladega Police Department spotted Calhoun in the area, pursued him on foot, but lost him. At one residence police obtained consent to search the homeowner's house and discovered Calhoun hiding under a bed.
"Forensic tests showed that the blood found on Calhoun's discarded clothes was consistent with L.P.'s blood. DNA tests performed on semen collected from the victim was consistent with Calhoun's DNA. Also, during the struggle between L.P. and Calhoun the two bit one another. A bite-mark expert testified that there was an extremely high probability that the bite mark on L.P.'s neck matched Calhoun's dental impression and that the bite mark on Calhoun's arm matched L.P.'s dental impression.
" [1] To protect the anonymity of one of the victims in this case, we have used her initials. See Rule 52, Ala. R.App. P."
Calhoun, 932 So.2d at 934-35.
All of Calhoun's claims involve allegations that counsel rendered ineffective assistance at various stages of the proceedings against him. In discussing ineffective-assistance-of-counsel claims, this Court has held:
"When reviewing claims of ineffective assistance of counsel, we apply the standard adopted by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance of counsel a petitioner must show: (1) that counsel's performance was deficient; and (2) that the petitioner was prejudiced by the deficient performance.
" 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, [350 U.S. 91] at 101 [ (1955) ]. There *464 are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
" Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. 2052.
" ' " 'This court must avoid using "hindsight" to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered in effective assistance.' " Lawhorn v. State, 756 So.2d 971, 979 (Ala.Crim.App.1999), quoting Hallford v. State, 629 So.2d 6, 9 (Ala.Crim.App.1992). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.'
" A.G. v. State, 989 So.2d 1167, 1171 (Ala.Crim.App.2007)."
Lee v. State, 44 So.3d 1145, 1154-55 (Ala.Crim.App.2009).
In order to prove the second prong of Strickland v. Washington, 466 U.S. 668, i.e., that the defendant was prejudiced by counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id."It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693.
Standard of Review
Generally, "[t]he standard of review on appeal in a post conviction proceeding is whether the trial judge abused his discretion when he denied the petition." Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992). " 'A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.' " Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005), quoting State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996) (internal citations omitted). However, "when the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). Additionally, in Ex parte Hinton, 172 So.3d 348, 353 (Ala.2012), the Alabama Supreme Court held that, when a circuit court's decision in a Rule 32 petition is based solely on the " 'cold trial record,' " it is "in no better position than ... an appellate court to make the determination it made." Therefore, in that situation, the reviewing court should apply a de novo standard of review. Id. The judge who presided over Calhoun's Rule 32 proceedings was not the judge who presided over Calhoun's trial and, because the petition was summarily dismissed, no evidentiary hearing was held. Accordingly, we review Calhoun's issues de novo.
We also note that, " 'even though this petition challenges a capital conviction and a death sentence, there is no plain-error review on an appeal from the denial of a Rule 32 petition.' " Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003), quoting Dobyne v. State, 805 So.2d 733, 740 (Ala.Crim.App.2000). " 'In addition, "[t]he procedural bars of Rule 32 apply with equal force to all cases, including *465 those in which the death penalty has been imposed." ' " Burgess v. State, 962 So.2d 272, 277 (Ala.Crim.App.2005), quoting Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995), quoting in turn State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993).
I.
Calhoun first argues that the circuit court erred when it summarily dismissed his claim that appellate counsel was ineffective for failing to adequately argue that a remand was necessary in order to demonstrate that Calhoun is intellectually disabled. In his petition, Calhoun noted that he was convicted and sentenced before the United States Supreme Court decided Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In Atkins, the Supreme Court held that it was a violation of the Eighth Amendment to execute a mentally retarded person. On direct appeal, this Court, noting that Calhoun had a low IQ, requested that the parties file supplemental briefs on the applicability of Atkins to Calhoun's case. After supplemental briefs were filed, this Court determined that "Calhoun does not fit even the most broad definition of mental retardation adopted by the Alabama Supreme Court in [Ex parte] Perkins, [851 So.2d 453 (Ala.2002) ]."
According to Calhoun, his appellate counsel's supplemental briefing on the applicability of Atkins constituted ineffective assistance of counsel under Strickland. Calhoun claimed that appellate counsel's performance was deficient because, he said, counsel "did not use even a single sentence in the supplemental brief to explain why a remand was necessary or what type of evidence Mr. Calhoun might present on remand." (C. 389.) Calhoun also argued that appellate counsel's briefing was deficient because, he says, counsel relied only on information contained within the trial record to demonstrate that Calhoun was mentally retarded. Calhoun claimed that, had appellate counsel conducted additional investigation, counsel would have discovered readily available evidence outside the record regarding Calhoun's mental retardation and a history of mental retardation in his family.
In Morris v. State, 60 So.3d 326, 339-41 (Ala.Crim.App.2010), this Court discussed the law as it relates to claims of mental retardation by capital defendants:
"The United States Supreme Court in Atkins provided guidelines for determining whether a person is mentally retarded to the extent that he or she should not be executed. However, the Court also held that ultimately the states should establish their own definitions. The Court stated:
" 'To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, 477 U.S. 399 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Id., at 405, 416-417.'
" 536 U.S. at 317, 122 S.Ct. at 2250. (Footnote omitted.)
"Alabama has yet to statutorily define mental retardation in the context of determining the sufficiency of an Atkins *466 claim. However, Alabama has defined a mentally retarded person for the purposes of the 'Retarded Defendant Act,' § 15-24-1 et seq., Ala.Code 1975, as follows:
" 'Mentally retarded person. A person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.'
" § 15-24-2(3), Ala.Code 1975.
"The Alabama Supreme Court has directed that review of Atkins claims are to be conducted applying the ' "most common" or "broadest" definition of mental retardation, as represented by the clinical definitions considered in Atkins and the definitions set forth in the statutes of other states that prohibit the imposition of the death sentence when the defendant is mentally retarded. See, e.g., Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002).' Smith v. State, 213 So.3d 239, 248 (Ala.2007). Moreover, in examining the definitions of mental retardation in other states with statutes prohibiting the execution of a mentally retarded person, the Alabama Supreme Court has written:
" 'Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).'
" Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002).
"Similarly, in suggesting guidance for determining whether a defendant is mentally retarded so as to prohibit the defendant's execution, the Atkins Court discussed clinical definitions of mental retardation and concluded that these definitions 'require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.' 536 U.S. at 318, 122 S.Ct. 2242. Further, '[i]mplicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18.' Smith v. State, 239 So.3d at 248."
60 So.3d at 339-40 (footnote omitted).
In Atkins, the United States Supreme Court further discussed mental retardation as follows:
"The American Association on Mental Retardation (AAMR) defines mental retardation as follows: 'Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
"The American Psychiatric Association's definition is similar: 'The essential feature of Mental Retardation is significantly subaverage general intellectual *467 functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.' Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). 'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43."
536 U.S. at 308 n. 3.
Rule 32.3, Ala. R.Crim. P., provides that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Further, Rule 32.6(b), Ala. R.Crim. P., provides:
"Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."
In Boyd v. State, 913 So.2d 1113, 1125-26 (Ala.Crim.App.2003), this Court held:
" ' Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts."
Thus, Calhoun was required to specifically plead and ultimately to prove that that appellate counsel failed to discover and present to this Court evidence that Calhoun had (1) significantly subaverage intellectual functioning; (2) significant or substantial deficits in adaptive behavior; and (3) that these problems manifested themselves before Calhoun was 18 years old. See Smith v. State, 213 So.2d 239 (Ala.2007), citing Ex parte Perkins, 851 So.2d 453 (Ala.2002). In its order dismissing this portion of Calhoun's petition, the circuit court found that Calhoun's claim was deficiently pleaded. The circuit court found that Calhoun had failed to adequately plead, among other things, that he suffered from significant or substantial deficits in adaptive behavior.
A review of Calhoun's petition supports the circuit court's finding. In his petition, Calhoun pleaded that he had significant limitations in adaptive functioning because, he said, his occupation consisted of "low-level construction work that did not require a high level of mental functioning." (C. 394.) According to Calhoun, the type of work he did "required little to no reading or math skills." However, the fact that a person's occupation does not require substantial reading or math skills does not necessarily imply that that person suffers from a substantial deficit in adaptive behavior. Calhoun did not plead that his alleged intellectual disability prevented him from working other types of jobs. As this Court noted on direct appeal, Calhoun *468 was working as a concrete finisher and was earning a wage of $17 per hour at the time of the murder. Calhoun, 932 So.2d 923, 978. Accordingly, Calhoun's claim regarding his employment status, if accepted as true, would not have established that Calhoun had deficits in adaptive behavior.
Calhoun also pleaded that a low level of adaptive functioning is prevalent in his family. However, the only specific facts Calhoun pleaded with regard to this claim were that his mother dropped out of school because she "could not learn" and that his sister has an IQ of 51 and "has received disability benefits since 2002 because, inter alia, she is mentally retarded." (C. 394-95.) Although Calhoun generally stated that "a number of his other relatives are mentally retarded" and that Teresa Hartfield, a teacher at the Childersburg Childhood Development Center, "taught four of Calhoun's relatives, all of whom are severely mentally retarded," Calhoun failed to identify those relatives and to specify their alleged disabilities. (C. 395.)
Calhoun then made the general allegation that "[a] family history of mental retardation has been identified as a factor likely to predispose a particular individual for mental retardation." (C. 395.) However, the specific facts pleaded by Calhoun, even if accepted as true, would not have established that he had a family history of mental retardation. Calhoun pleaded no specific facts regarding his mother's IQ or level of adaptive functioning, nor did he plead any specific facts regarding his sister's level of adaptive functioning. Thus, the circuit court could not have determined from Calhoun's petition whether his mother or sister were mentally retarded and, therefore, whether Calhoun had a family history of mental retardation.
We note that Calhoun did plead that he has an IQ of 61, that he had many difficulties in school, and that this alleged subaverage intellectual functioning manifested before he was 18 years old. However, Calhoun failed to adequately plead that he suffered from significant or substantial deficits in adaptive behavior. In Smith, supra, the Alabama Supreme Court held that "[a]ll three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim." Thus, Calhoun failed to plead facts that, if true, would have established that he was mentally retarded.
Accordingly, Calhoun's petition does not specifically reveal what facts appellate counsel could have discovered and presented to this Court on direct appeal that would have established that Calhoun suffered from significant limitations in adaptive behavior and that would have, therefore, caused this Court to remand his case for an Atkins hearing. Consequently, Calhoun failed to meet the pleading requirements of Rule 32.6(b), Ala. R.Crim. P., with regard to appellate counsel's alleged deficient performance. Because Calhoun failed to adequately plead that appellate counsel's performance was deficient, Calhoun's allegation that he was prejudiced as a result of counsel's performance is immaterial. See Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one.").
Rule 32.7(d), Ala. R.Crim. P., provides that a circuit court may summarily dismiss a petition if "the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings." Because Calhoun's ineffective-assistance-of-appellate-counsel claim was insufficiently *469 pleaded, the circuit court correctly summarily dismissed it.
II.
Next, Calhoun argues that the circuit court erred when it summarily dismissed his claims relating to the penalty phase of his trial. In his petition, Calhoun claimed that trial counsel "essentially conducted no investigation" into potential mitigating evidence and, consequently, failed to discover and to present this mitigating evidence to the jury during the penalty phase. (C. 368.) Calhoun also claimed that trial counsel failed to present effective opening and closing arguments during the penalty phase, failed to raise proper objections during the sentencing phase regarding certain comments by the prosecutor, failed to object to allegedly improper jury instructions, failed to object to an allegedly inaccurate presentence report, and failed to establish a trusting relationship with Calhoun. According to Calhoun, trial counsel's representation during the penalty phase of his trial constituted ineffective assistance of counsel under Strickland.
A.
Calhoun argues that the circuit court erred when it summarily dismissed his claims that trial counsel were ineffective for failing to investigate, discover, and present certain mitigating evidence during the penalty phase of his trial.
1.
In his petition, Calhoun claimed that trial counsel failed to "ensure that a proper mental health examination was conducted." (C. 375.) According to Calhoun, trial counsel conducted an inadequate investigation into potential mitigating evidence, thus preventing his mental-health expert, Dr. Allen Shealy, from testifying about "Calhoun's numerous mental disabilities." (C. 375.) Calhoun also alleged that, had counsel conducted an adequate investigation, Dr. Shealy would have been able to testify to Calhoun's "potential psychiatric disorders," as well as the fact that Calhoun was expelled from school for drawing sexually explicit pictures, that he was sent to a school for mentally dysfunctional children, and that he had once attempted suicide by swallowing pills. (C. 376.) Thus, Calhoun said, instead of testifying about Calhoun's childhood and family life, Dr. Shealy testified that Calhoun was malingering during his evaluation in an attempt to fake mental retardation.
However, on appeal, Calhoun argues that trial counsel were ineffective for failing to gather and to present this evidence to the jury themselves-not that counsel were ineffective for failing to ensure that Dr. Shealy was provided with the evidence so that Dr. Shealy could have conducted a more thorough mental-health examination. The thrust of the argument in Calhoun's petition was that Dr. Shealy did not conduct a proper mental-health examination because trial counsel failed to conduct an adequate investigation. That argument is different from the argument raised in Calhoun's brief on appeal.
"Review on appeal is restricted to questions and issues properly and timely raised at trial." Newsome v. State, 570 So.2d 703, 717 (Ala.Crim.App.1989). "An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented." Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App.1992). Additionally, "it is well settled that '[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.' " English v. State, 10 So.3d 620, 621 (Ala.Crim.App.2007), quoting Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997). Accordingly, Calhoun's argument regarding trial counsel's *470 failure to ensure that a proper mental-health evaluation was conducted is not preserved for appellate review.
We note that Calhoun does make passing mention in his brief on appeal of trial counsel's failure to provide Dr. Shealy with adequate information. (Calhoun's brief, at 51.) However, in the two sentences devoted to that argument, Calhoun fails to cite any legal authority supporting his position. In Egbuonu v. State, 993 So.2d 35, 38-39 (Ala.Crim.App.2007), this Court held:
" Rule 28(a)(10), Ala. R.App. P., requires that an argument contain 'the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.' 'Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.' Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). 'Authority supporting only "general propositions of law" does not constitute a sufficient argument for reversal.' Beachcroft Props., LLP v. City of Alabaster, 901 So.2d 703, 708 (Ala.2004), quoting Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App.1997)."
Accordingly, to the extent Calhoun's argument could be considered preserved, it fails to comply with Rule 28(a)(10), Ala. R.App. P., and he is due no relief on that claim.
2.
Calhoun next claimed that, had trial counsel conducted a reasonable investigation, they would have discovered mitigating evidence regarding his family history. The circuit court found that these claims lacked the specificity required by Rule 32.6(b), Ala. R.Crim. P.
A review of Calhoun's petition reveals that Calhoun described, in general terms, a lifetime of poverty and abuse. Calhoun stated that "Ms. Sims, who has taught many poor students throughout the years, learned after visiting the Calhoun house that Mr. Calhoun lived at a level of poverty she had never even imagined existed."[1] (C. 372.) Calhoun also claimed that he was abandoned by his father and raised by a stepfather who was later murdered by a family member whose identity is not disclosed. According to Calhoun, his step father was mentally and physically abusive and "committed numerous acts of sexual abuse in the house in which Mr. Calhoun grew up." (C. 372.) Calhoun also claimed that he was exposed to incestuous sexual abuse and that this type of behavior was "rampant" among Calhoun's family members.
However, Calhoun did not specifically describe the level of poverty he was raised in. Rather, Calhoun generally described it as "abject" and referenced "Ms. Sims's" assessment of his family's living situation. (C. 372.) Calhoun also failed to identify any specific examples of abuse or incest he was exposed to, nor does he identify any witnesses who would have testified about the abuse or incest. Calhoun merely alleged that "[a] number of witnesses could have testified to [his stepfather's] many violent acts." (C. 373.) Thus, Calhoun failed to plead specific facts that trial counsel could have discovered and presented during the penalty phase that would have demonstrated that Calhoun had grown up in an impoverished and abusive environment. Accordingly, Calhoun failed to meet *471 the pleading requirement of Rule 32.6(b), Ala. R.Crim. P. See Boyd, supra .
We note that Calhoun's mother, Patricia Garrett, testified during the penalty phase and stated that Calhoun's father had abandoned the family and had virtually no contact with Calhoun. Thus, any additional testimony regarding Calhoun's paternal abandonment would have been cumulative. See Stallworth v. State, 171 So.3d 53, 74 (Ala.Crim.App.2013), quoting United States v. Harris, 408 F.3d 186, 191 (5th Cir.2005), citing in turn Murray v. Maggio, 736 F.2d 279, 282 (5th Cir.1984) )(" 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' ").
3.
Next, Calhoun claimed that trial counsel were ineffective for failing to obtain "institutional records" pertaining to himself, his parents, and his siblings that, he said, "were available at the time of the trial and were an obvious source of potential mitigation evidence." (C. 374.) Calhoun claimed that he was placed in special-education classes while he was in school, that he was 16 years old when he was in the ninth grade, and that he failed a military entrance exam that tested basic skills. Calhoun also stated that he was placed in a school for children with mental disabilities after he was expelled from high school for drawing sexually explicit pictures but that he dropped out of that school after two days. According to Calhoun, his educational records would have supported these claims.
However, Calhoun stated that the Talladega County school district destroyed the vast majority of Calhoun's educational records on or after 2003. (C. 374.) Thus, Calhoun admittedly would not be able to prove what, if any, mitigating evidence had been contained in those records. Calhoun also failed to specifically identify any witnesses who could testify regarding the contents of those records. The only witness Calhoun specifically mentions is his former teacher, Ms. Sims. According to Calhoun, Ms. Sims would have testified that Calhoun was expelled from high school and placed in a school for children with mental disabilities after Calhoun was caught drawing sexually explicit pictures.
However, Calhoun did not specifically identify what mental disabilities he suffered from that required him to be placed in special-education classes. Similarly, Calhoun did not identify any information regarding his family members that could have been uncovered had counsel obtained his institutional records, nor did he specifically identify the military exam he allegedly failed. Additionally, Calhoun failed to explain how trial counsel's failure to call Ms. Sims as a witness prejudiced Calhoun during the penalty phase. Given the sexual nature of the crimes for which Calhoun was convicted, it was incumbent on him to explain why the jury would have been swayed had they known that he had been expelled from school for drawing sexually explicit pictures. Accordingly, Calhoun failed to meet the pleading requirements with regard to trial counsel's failure to obtain institutional records. See Boyd, supra.
4.
Calhoun also claimed that trial counsel were ineffective for failing to present evidence of his positive character, including his "solid employment history" and his good relationship with several members of his family. The circuit court found these claims to be deficiently pleaded under Rule 32.6(b), Ala. R.Crim. P.
In his petition, Calhoun stated that, had counsel conducted an adequate investigation, they would have discovered that Calhoun *472 had a "good employment history and exemplary work ethic." (C. 375.) Calhoun listed the names of three former supervisors and alleged that each would have testified that Calhoun was a good and reliable employee who was willing to work long hours if needed. (C. 375.) Calhoun then opined that, "[h]ad trial counsel presented the wealth of evidence regarding Mr. Calhoun's strong work ethic and consistent dependability, there is a reasonable probability that the jury would not have sentenced him to death." (C. 375.)
We first note that the testimony from Calhoun's former employers would not have constituted a "wealth of evidence." Rather, each of the employers Calhoun listed would, according to Calhoun, have testified that Calhoun was a good and dependable employee. Calhoun did not identify any specific instances or examples that his employers could have testified to in order to demonstrate Calhoun's general assertion that he had an exemplary work ethic. Additionally, Calhoun failed to explain in his petition how evidence relating to his employment history would have been so compelling as to change the outcome of the penalty phase of his trial.
Regarding his positive character, Calhoun stated that his older sister, Katie Calhoun, would have testified that they had a close relationship and that Calhoun was very protective of her. Additionally, Calhoun identified five half siblings who, he said, would have testified that Calhoun "was a good brother who worked hard at ensuring the family remained close, despite Mr. Calhoun living with his mother and stepfather." (C. 378.) Calhoun also stated that his half sister, Theresa Lawson, would have testified that Calhoun "had a great relationship with her children, who looked up to and enjoyed spending time with him." (C. 378.) Finally, Calhoun stated that his son, Centauris Calhoun, would have testified that he and his father maintained a close relationship and that Calhoun was a good father.
However, similar to Calhoun's claims regarding his work ethic, Calhoun's claims regarding his positive character are general in nature. Calhoun failed to identify any specific instances or examples his family members could have testified to that would have demonstrated his positive character. Accordingly, Calhoun failed to plead with the required specificity that trial counsel were deficient for failing to interview his family members and former employers. See Rule 32.6(b), Ala. R.Crim. P.
In summary, this section of Calhoun's petition presented a narrative that portrayed Calhoun as a man who grew up in an impoverished and abusive household, who suffered from mental impairments that hindered his education and his life, but who nonetheless exhibited positive character traits in his work and family life. However, Calhoun's petition did not specifically set out with sufficient detail the testimony and evidence that, if discovered by trial counsel and presented during the penalty phase would have changed the outcome of that proceeding. Thus, Calhoun did not plead specific facts that, if proven true at an evidentiary hearing, would have established that trial counsel was ineffective under Strickland. See Boyd, supra.
B.
Calhoun also claimed that trial counsel were ineffective for failing to present effective opening and closing arguments during the penalty phase, failing to raise proper objections during the sentencing phase regarding certain comments by the prosecutor, failing to object to allegedly improper jury instructions, failing to object to an allegedly inaccurate presentence report, and failing to establish a *473 trusting relationship with Calhoun. However, in his brief on appeal, Calhoun fails to adequately argue any of these claims. In a single paragraph of his brief, Calhoun merely restates these allegations from his petition and generally argues that these errors, "when considered in conjunction with trial counsel's failure to adequately investigate and present mitigating evidence, further demonstrate trial counsel's ineffective assistance." (Calhoun's brief, at 56.)
Calhoun cites no legal authority to support these contentions. Accordingly, Calhoun has failed to comply with Rule 28(a)(10), Ala. R.App. P., and those arguments are deemed to be waived. See Egbuonu, supra.
C.
Calhoun raised additional arguments in his petition regarding trial counsel's alleged ineffectiveness during the penalty phase of the trial. However, Calhoun fails to address those arguments in his brief on appeal. Allegations that are not expressly argued on appeal are deemed to be abandoned and will not be reviewed by this Court. Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995).
III.
Calhoun also argues that the circuit court erred when it summarily dismissed his claims pertaining to the guilt phase of his trial. According to Calhoun, trial counsel were ineffective for numerous reasons during the guilt phase of his trial.
A.
First, Calhoun argues that the circuit court erred when it summarily dismissed his claim that trial counsel were ineffective for failing to object to certain of the State's peremptory strikes, which Calhoun alleges were improper under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In his petition, Calhoun pleaded only two specific facts regarding the prosecution's peremptory strikes: (1) that the prosecutor used 8 of his 19 peremptory strikes to remove 8 of the 12 black venire members and (2) that Talladega County prosecutors "have struck disproportionately high numbers of black prospective jurors from venires as a pattern and practice for years." (C. 343.)
In its order dismissing Calhoun's petition, the circuit court found that Calhoun had failed to comply with the specificity requirements or Rule 32.6(b), Ala. R.Crim. P. The circuit court also noted this Court's holding in Calhoun's direct appeal, that "the record fail[ed] to establish a prima facie case of racial discrimination." Calhoun v. State, 932 So.2d 923, 943 (Ala.Crim.App.2005) (finding no plain error regarding Batson ).
As noted, Calhoun pleaded only that the prosecutor used 8 of his peremptory strikes to remove 66% of the black veniremembers. "Numbers alone are not sufficient to establish a prima facie case of discrimination." Blackmon v. State, 7 So.3d 397, 413 n. 2 (Ala.Crim.App.2005), citing Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001). Accordingly, even if trial counsel had brought the number of black jurors that were struck to the trial court's attention, such an assertion would not have established a prima facie case of racial discrimination in violation of Batson. This Court has held that counsel is not ineffective for failing to assert a meritless claim. Patrick v. State, 680 So.2d 959, 963 (Ala.Crim.App.1996).
Calhoun also claimed that Talladega County prosecutors had a history of using peremptory strikes in a racially discriminatory manner. In support of that allegation, *474 Calhoun cited several cases, the most recent being Smith v. State, 611 So.2d 413 (Ala.Crim.App.2002). Calhoun also asserted that "not a single black juror served on a petit jury in Talladega from 1950 to 1965." (C. 344.) However, this Court has noted that when the history of racially discriminatory jury strikes is attenuated, as it is in Calhoun's case, "this factor, based on the passage of time, does not establish a prima facie case of racial discrimination." McCray v. State, 88 So.3d 1, 24 (Ala.Crim.App.2010). Accordingly, any objection based on the Talladega County district attorney's office's history of discriminatory jury strikes would have been unavailing in light of the passage of time. Thus, trial counsel were not ineffective for failing to raise these issues during voir dire. See Patrick v. State, supra.
Calhoun did assert that trial counsel "should have argued that the State struck a large number of African-American jurors; that these excluded black venire members were otherwise qualified to serve and did not possess any common characteristic except for their race, suggesting that the leading characteristic they shared was their race; [and] that the prosecutor did not engage in intensive voir dire with the black venire members eliminated." (C. 343.) However, Calhoun did not specifically identify any of the black venire-members who he alleged were qualified to serve but who were ultimately struck based on their race. Additionally, Calhoun failed to identify what he believed would have constituted "intensive voir dire" with black veniremembers, nor did he contrast the prosecution's voir dire of black venire-members with the prosecution's voir dire of white veniremembers. Calhoun's bare allegation that trial counsel should have objected on these grounds does not meet the specificity requirement of Rule 32.6(b), Ala. R.Crim. P. See Boyd, supra.
We note that Calhoun asserted that trial counsel declined to put forth a Batson challenge based on counsel's belief that the State's peremptory strikes were not unconstitutional "because the percentage of African-Americans on the jury was greater than the percentage on the original venire." (C. 342.) According to Calhoun, the law does not support trial counsel's belief. However, as noted above, Calhoun did not adequately plead facts that, if true, would have established that the prosecution engaged in racially discriminatory behavior. Thus, trial counsel's belief at the time they waived a Batson challenge was not material to the circuit court's determination that Calhoun failed to adequately plead this claim in his Rule 32 petition.
Finally, Calhoun, citing Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), claimed that trial counsel were ineffective for failing to allege that there existed a prima facie case of racial discrimination in the Talladega County jury-selection process. In support of this allegation, Calhoun alleged that blacks constituted 24% of the venire in his case despite the fact that blacks constitute 34% of the population of Talladega County. However, as this Court noted in Calhoun v. State, 932 So.2d 923, 939 (Ala.Crim.App.2005),
"Calhoun had the burden of establishing a prima facie showing of racial discrimination. As the United States Supreme Court stated in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) :
" 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair *475 and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'
" 439 U.S. at 369, 99 S.Ct. 664."
In his petition, Calhoun failed to plead that the alleged underrepresentation of blacks on his jury was the result of any systematic exclusion in the jury-selection process. Calhoun's bare assertion that the disparity was due to racial discrimination does not satisfy the pleading requirement of Rule 32.6(b), Ala. R.Crim. P. See Boyd, supra. Because Calhoun's claims regarding counsel's alleged ineffectiveness during jury selection were either meritless or insufficiently pleaded, the circuit court was correct to summarily dismiss them. See Rule 32.7(d), Ala. R.Crim. P.
B.
Next, Calhoun argues that the circuit court erred when it summarily dismissed his claim that trial counsel were ineffective for failing to challenge the use of Calhoun's mother, Patricia Garrett, as a "Court's witness." (C. 352.) According to Calhoun, this allowed the State to "use leading questions to elicit from Ms. Garrett an alleged admission from [Calhoun] pertaining to the Phillips murder." (C. 352.) The circuit court found that this claim was deficiently pleaded because, it said, Calhoun did not state what objection trial counsel should have made, nor did he cite any legal authority to support his contention that the trial court's decision to call Garrett as a court's witness was error.
In his petition, Calhoun specifically referenced Garrett's testimony on pages 1118-19 and 1127 of the trial transcript. A review of the record from Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005), reveals that the prosecutor asked Garrett whether she told Calhoun that she had heard the Calhoun killed someone. When Garrett answered in the affirmative, the following exchange occurred:
"[Prosecutor]: And what was [Calhoun's] response when you said, Cody[2] they said you done killed a man?
"[Garrett]: He said, 'I don't know. I might have did.' "
(R1.1119.)[3] Thus, although the prosecutor was allowed to use leading questions during portions of its examination of Garrett, Garrett's testimony regarding Calhoun's admission was given in response to a non-leading question. Accordingly, Calhoun's argument regarding the prosecution's ability to use leading questions was meritless.
Moreover, Calhoun failed to allege what Garrett's testimony would have included had she not been called as a court's witness. In his petition, Calhoun asserted that, "[h]ad counsel brought this error to the Court's attention, Mrs. Garrett would not have been called as a court's witness and the State would not have been able to subject her to cross-examination." (C. 352.) However, Calhoun failed to allege that Garrett would have given different testimony had she not been called as a court's witness. The fact that Garrett's testimony regarding Calhoun's apparent admission was elicited with an open-ended question suggests that Garrett would have given the same testimony even if the prosecution had not been allowed to cross-examine her. Nevertheless, Calhoun failed to adequately plead this claim as required by Rule 32.6(b), Ala. R.Crim. P., *476 and the circuit court did not err by summarily dismissing it.
C.
Next, Calhoun argues that the circuit court erred by summarily dismissing his claims that trial counsel were ineffective for failing to object to allegedly faulty jury instructions. We will address each issue in turn.
1.
First, Calhoun claimed that trial counsel were ineffective "for failing to object to the State's constitutionally infirm directive that when the defendant formed his intent to rob was 'not material' to the jury's consideration of the robbery-murder charge." (C. 357.) Calhoun does not indicate in his petition when the State made this assertion, nor did he cite to any portion of the record. In his brief on appeal, Calhoun cites to a portion of the State's rebuttal closing argument in which the prosecutor discussed the time frame during which the crimes occurred, as well as Calhoun's general intent to kill Tracy Phillips and to rape Phillips's wife. (Calhoun's brief, at 69), citing (R1.1533-34). However, that portion of the record contains no assertions by the prosecutor regarding when Calhoun formed the intent to rob, rape, or sodomize any of the victims. Because Calhoun fails to cite to the relevant portions of the record, his brief does not comply with Rule 28(a)(10), Ala. R.App. P. See Egbuonu v. State, supra.
Calhoun also claimed that counsel were ineffective for failing to "effectively challenge the submission of the charge of robbery-murder to the jury where the evidence demonstrated that Mr. Calhoun did not form the intent to rob until after the murder was committed." (C. 357.) However, Calhoun did not specifically explain how the evidence presented at trial demonstrated that he had not formed the intent to rob before the murder was committed. Accordingly, Calhoun failed to adequately plead his claim regarding the trial court's instruction on the offense of murder made capital because if was committed during a robbery. See Rule 32.6(b), Ala. R.Crim. P.
Moreover, this Court's holding on direct appeal makes clear that ample evidence was presented to the jury indicating that Calhoun intended to rob the Phillips family before he murdered Tracy Phillips. As this Court noted:
"Here, the evidence showed that Calhoun knew that the Phillipses were having a yard sale at their home. Calhoun approached L.P. early on the day of the murder as she was posting yard-sale signs. The signs indicated that a television would be offered for sale at the yard sale, and Calhoun went to the Phillipses' house to inquire about the television. L.P. testified that Calhoun came back to their house later that evening and that he was wearing a stocking mask over his head and was armed with a handgun. When Tracy Phillips offered him money he declined. Instead, Calhoun forced L.P. to strip and then forced her husband to put his head between his wife's legs. Calhoun then shot Tracy Phillips in the back of his head. He then raped, sodomized, and beat L.P. L.P. said that after he was finished raping her he said to her, 'I know you have some money. Go upstairs and get it. I know your husband has some money. Go upstairs and get his wallet.' (R. 660.)
"Certainly, the evidence that was presented was more than sufficient for a jury to conclude that Calhoun intended to commit a robbery when he killed Tracy Phillips. This issue was correctly presented to the jury for its determination."
Calhoun, 932 So.2d at 967.
Calhoun also claimed that counsel were ineffective for failing to "challenge the submission *477 of the charge of rape-murder and sodomy-murder where there was no evidence indicating that the defendant intended to rape and sodomize the murder victim, Tracy Phillips." (C. 357.) However, in his brief on appeal, Calhoun does not raise any argument regarding the trial court's jury instructions on murder during a rape or murder during a sodomy. Allegations that are not expressly argued on appeal are deemed to be abandoned and will not be reviewed by this Court. Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995).
2.
Next, Calhoun claimed that trial counsel were ineffective for failing to request a jury instruction on the lesser-included offense of felony murder despite the fact that during closing arguments counsel referenced felony murder as a viable alternative. (C. 358.) According to Calhoun, this failure deprived the jury of the opportunity to convict Calhoun "of a lesser included offense [that was] supported by the evidence." (C. 358.) However, similar to the previous claim, Calhoun failed to explain in his petition how the evidence presented at trial would have supported a jury instruction on felony murder. Accordingly, Calhoun failed to meet the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. See Boyd, supra.
In his brief on appeal, Calhoun argues that his petition was sufficiently specific, relying exclusively on trial counsel's assertion to the jury that felony murder would have been a viable alternative verdict. However, the assertions of counsel are not evidence. Thus, Calhoun failed to identify, in his petition or in his brief, any evidence that would have supported a felony-murder instruction.
Calhoun also claimed that trial counsel were ineffective for failing to submit proper verdict forms and to challenge the verdict forms that were given to the jury. According to Calhoun, the trial court's instructions, as well as the verdict forms that were given to the jury, deprived the jurors of "a viable 'third option' " by instructing the jury that the two lesser-included offenses were mutually exclusive. (C. 358.) Calhoun claimed that the trial court's instructions, as well as the jury forms, gave the jury only three options: (1) Calhoun was guilty of capital murder; (2) Calhoun was guilty of the underlying felony, i.e., first-degree robbery, rape, or sodomy; or (3) Calhoun was not guilty. Essentially, Calhoun claimed that trial counsel were ineffective for not objecting to the trial court's failure to instruct the jury on felony murder.
However, as noted above, Calhoun did not explain in his petition how the evidence at trial would have supported such an instruction. Like his claim that trial counsel should have requested a felony-murder instruction, Calhoun's claim that trial counsel were ineffective for failing to object to the trial court's jury instructions and the verdict forms is not sufficiently specific as required by Rule 32.6(b), Ala. R.Crim. P. Moreover, this Court held on direct appeal that there was no reasonable basis for a felony-murder instruction.
3.
Next, Calhoun argues that the circuit court erred by summarily dismissing his claim that trial counsel were ineffective for not objecting to the trial court's alleged failure "to instruct the jury that [the jury's] findings on mitigating circumstances need not be unanimous for individual jurors to consider such factors." (Calhoun's brief, at 75.) Calhoun made the same claim in his petition. However, Calhoun failed to identify what mitigating factors the jury would have found but for the absence of this instruction. The entirety of Calhoun's claim regarding this issue is *478 as follows: "Counsel were additionally ineffective for failing to object to the trial court's erroneous and misleading instructions to the jury. Specifically, counsel failed to object to ... the Court's failure to instruct the jury that its findings on mitigating circumstances need not be unanimous for individual jurors to consider such factors in violation of Mills [v. Maryland], 486 U.S. 367 [ (1988) ]...." (C. 356.) Calhoun's bare allegation was insufficient to satisfy the pleading burden of Rule 32.6(b), Ala. R.Crim. P.
4.
Next, Calhoun argues that the circuit court erred by summarily dismissing his claim that trial counsel were ineffective for failing to object to improper victim-impact testimony and failing to request a limiting instruction on how the jury was to consider such testimony. In his petition, Calhoun claims that certain testimony from the victim's children constituted improper victim-impact testimony and served no purpose other than to elicit the passion and sympathy of the jury.
At Calhoun's trial, the victim's son and daughter testified about the last time they saw their father. However, each child's testimony was necessary to the State's case and served to place Calhoun at the scene of the crime and to describe the events surrounding the crime. The victim's son testified about Calhoun's interaction with his father when Calhoun came to the Phillips home on the day the crimes were committed to inquire about purchasing a television. Similarly, the victim's daughter testified about seeing her father's body after he was shot. A review of the record reveals that, in both instances, the witness's testimony was in response to open-ended questions regarding the events leading up to and during the crimes. As this Court noted on Calhoun's direct appeal: "[W]e are more than confident that this testimony had no prejudicial impact on Calhoun's trial." Calhoun, 932 So.2d at 968. Accordingly, the testimony was not improper and trial counsel were not ineffective for failing to raise a baseless objection or to request an unnecessary limiting instruction. See Patrick v. State, supra.
5.
Next, Calhoun argues that the circuit court erred when it summarily dismissed his claim that trial counsel were ineffective for failing to object to testimony regarding Calhoun's prior bad acts and to request a relevant limiting instruction. In his petition, Calhoun claimed that Officer Charles Hedrick's testimony that he knew Calhoun "implied to the jury that Mr. Calhoun had such a significant criminal history that the officer knew him well." (C. 351.) Calhoun also alleged that the prosecutor emphasized that testimony during closing arguments. However, a review of the record reveals that the prosecutor, during his direct examination and closing argument, in no way suggested that Officer Hedrick knew Calhoun because of any prior criminal behavior. The fact that Officer Hedrick knew Calhoun, without any additional testimony, did not imply that Calhoun had a criminal record. Accordingly, any objections regarding that testimony would have been overruled. Therefore, trial counsel were not ineffective for failing to object to Hedrick's testimony. See Patrick v. State, supra.
Calhoun also claimed that Officer Wren Cooley gave similar testimony regarding his familiarity with Calhoun. However, a review of Officer Cooley's testimony reveals that Cooley did not state that he knew Calhoun. Accordingly, that claim is refuted by the record.
Additionally, Calhoun claimed that trial counsel should have objected to Dale Morris's testimony. According to Calhoun, Morris's testimony that Calhoun pulled a *479 gun on him the day the crimes were committed constituted prior-bad-act evidence and should have been excluded. However, a review of the entirety of his testimony reveals that Morris understood Calhoun's actions to be a joke. Morris testified that Calhoun stated: "I'm just playing with [Morris]" and then gave the gun to Morris. (R1.807.) Morris stated that the gun was not loaded. Accordingly, any objections to Morris's testimony would have been unavailing. Consequently, trial counsel were not ineffective for failing to raise a baseless objection or to request an unnecessary limiting instruction. See Patrick v. State, supra.
D.
Calhoun next argues that the trial court erred by summarily dismissing his claim that trial counsel were ineffective for failing to object to several instances of alleged prosecutorial misconduct. We will address each claim in turn.
1.
First, Calhoun claimed that trial counsel were ineffective for failing to object to the prosecutor's use of leading questions. In a footnote to his petition, Calhoun cited over 300 instances in the record where he claimed the prosecutor improperly led a witness. (C. 362.) However, Calhoun discussed only two examples with the following sentence: "This leading questioning prejudiced Mr. Calhoun in a number of ways, including allowing the State to correct for misstatements by one of its own witnesses, Michael Spurling (R. 909-10), and imply to the jury that Mr. Calhoun was actually a wanted man for acts unrelated to the charged crimes (R. 1005)." (C. 362-63.)
That allegation does not contain sufficient facts that, if true, would demonstrate prosecutorial misconduct. Calhoun did not specifically describe what misstatements were allegedly corrected by the prosecutor during Michael Spurling's testimony, nor did he explain how the prosecutor's questions implied that Calhoun was a wanted man. Accordingly, Calhoun's claim regarding the prosecutor's use of leading questions did not comply with the specificity requirement of Rule 32.6(b), Ala. R.Crim. P. See Boyd, supra.
Calhoun also alleged that the prosecutor "improperly bolstered the testimony of the witnesses it presented by restating each witness's answer." (C. 363.) In a footnote, Calhoun cited over 60 places in the record in which he claims the prosecutor improperly bolstered its witness's testimony by repeating the witness's answers. However, Calhoun failed to explain how repeating a witness's answer bolsters the witness's testimony. In reviewing the record, it appears that the prosecutor was merely clarifying the witness's answer. For example, during Officer Hedrick's testimony, the following exchange occurred:
"[Prosecutor]: And approximately what time that evening would you have first made contact and located the vehicle?
"[Officer Hedrick]: It was around 11:30 p.m.
"[Prosecutor]: Around 11:30 p.m.
"[Officer Hedrick]: Yes."
(R1.1076.) Accordingly, the record refutes Calhoun's assertion that the prosecutor improperly bolstered its witness's testimony by repeating the witness's answers. Because the State did not commit prosecutorial misconduct by repeating certain answers given by witnesses, trial counsel were not ineffective for failing to object. See Patrick v. State, supra.
2.
Second, Calhoun claimed that the prosecutor committed misconduct by characterizing Calhoun's request for jury instructions *480 on lesser-included offenses as a plea for sympathy. According to Calhoun, this characterization encouraged the jury not to consider the lesser-included offenses at all. However, Calhoun did not plead any facts indicating that the jury did not consider lesser-included offenses in its deliberations. Accordingly, this claim failed to meet the specificity requirement of Rule 32.6(b), Ala. R.Crim. P.
3.
Next, Calhoun claimed that the prosecutor misstated the law by telling the jury that Calhoun presented only one mitigating circumstance and that it was outweighed by the four aggravating circumstances. It appears that Calhoun is under the impression that the prosecutor was attempting to mislead the jury by having it add up the aggravating circumstances and compare that to the number of mitigating circumstances. However, a review of the record reveals that the prosecutor stated the following during the penalty phase:
"Let's say for some stretch that you believe that [Calhoun proved the existence of a mitigating circumstance]. That's one, and we've proven four; and I believe without question ours outweigh what, if any, they have proved...."
(R1.1653)(Emphasis added.) Thus, the record refutes Calhoun's assertion that the prosecutor misstated the law.
Calhoun also claimed in his petition that the prosecutor mischaracterized Patricia Garrett's testimony as a mere plea for her son's life, "thereby leading the jury to believe that was all the mitigation that the jury could consider." (C. 365.) However, in his brief on appeal, Calhoun argues that the prosecutor acted improperly by characterizing Garrett's testimony as a plea for sympathy and then telling the jury that it was prohibited from basing its sentence on sympathy. Therefore, Calhoun contends, the prosecutor essentially instructed the jury not to consider the mitigating evidence. This argument is different from the argument raised in Calhoun's petition and, therefore, is not properly preserved for appellate review. "[I]t is well settled that '[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.' " English v. State, 10 So.3d 620, 621 (Ala.Crim.App.2007), quoting Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
4.
Finally, Calhoun argues that the prosecutor "improperly encouraged a guilty verdict based on passion and prejudice by characterizing this crime as 'the most horrible act that you could have ever committed,' (R. 1510), and encouraging the jury to convict Mr. Calhoun based on the nature of the crimes charged rather than on a finding that each element of each crime had been proven beyond a reasonable doubt." (Calhoun's brief, at 82.) However, Calhoun cites no legal authority for this proposition. Accordingly, his final argument regarding prosecutorial misconduct does not comply with Rule 28(a)(10), Ala. R.App. P., and is deemed waived. See Egbuonu, supra.
E.
Calhoun next argues that the circuit court erred by summarily dismissing his claim that trial counsel were ineffective for failing to object to the admission of "an unreliable rape kit." (Calhoun's brief at 83.) However, in his brief on appeal, Calhoun cites no legal authority in support of this argument. Accordingly, the argument is deemed to be waived because it does not comply with Rule 28(a)(10), Ala. R.App. P. See Egbuonu, supra.
*481 F.
Next, Calhoun argues that the circuit court erred by summarily dismissing his claim that trial counsel were ineffective for failing to present evidence to the jury indicating that Calhoun was not guilty of capital murder. However, Calhoun again fails to provide any legal authority in support of his argument. For the reason stated in the previous section, this argument is deemed to be waived. See Egbuonu, supra.
Calhoun also argues that trial counsel's closing argument constituted ineffective assistance because, he says, "[a]t no point did counsel advance an argument by which Mr. Calhoun was not guilty of capital murder or present a viable defense theory on Mr. Calhoun's behalf." (Calhoun's brief, at 87.) Calhoun then cites to Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), for the general proposition that "no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." However, authority supporting only general propositions of law does not constitute a sufficient argument for reversal. Accordingly, this argument also fails to comply with Rule 28(a)(10), Ala. R.App. P. See Egbuonu, supra.
Because Calhoun's ineffective-assistance-of-counsel claims relating to the guilt phase of his trial were either facially meritless or insufficiently pleaded, the circuit court did not err by summarily dismissing them. See Rule 32.7(d), Ala. R.Crim. P.
We note that Calhoun raised additional arguments in his petition relating to the guilt phase of his trial but did not advance those arguments in his brief on appeal. Allegations that are not expressly argued on appeal are deemed to be abandoned and will not be reviewed by this Court. Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995).
IV.
Finally, Calhoun argues that the trial court erred by adopting the State's proposed order verbatim. Citing, among other cases, Ex parte Ingram, 51 So.3d 1119 (Ala.2010), Calhoun notes that appellate courts look with disfavor on a trial court's wholesale adoption of a party's proposed order. According to Calhoun, the trial court's order contains manifest errors of law and fact. In Mashburn v. State, 148 So.3d 1094, 1110-12 (Ala.Crim.App.2013), this Court held:
" 'Alabama courts have consistently held that even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.' McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003). 'While the practice of adopting the state's proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.' Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). '[T]he general rule is that, where a trial court does in fact adopt the proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court.' Ex parte Ingram, 51 So.3d at 1122.
"In Ex parte Ingram, the circuit court adopted verbatim the State's proposed order summarily dismissing Ingram's Rule 32 petition. In the order, the court stated that it had considered ' "the events within the personal knowledge of the Court" ' and that it had ' "presided over Ingram's capital murder trial and *482 personally observed the performance of both lawyers throughout Ingram's trial and sentencing." ' Ex parte Ingram, 51 So.3d at 1123 (citation and emphasis omitted). However, the judge who had summarily dismissed the petition had not, in fact, presided over Ingram's trial and had no personal knowledge of the trial. The Alabama Supreme Court described these errors in the court's adopted order as 'the most material and obvious of errors,' 51 So.3d at 1123, and 'patently erroneous,' 51 So.3d at 1125, and concluded that the errors 'undermine[d] any confidence that the trial court's findings of fact and conclusions of law [we]re the product of the trial judge's independent judgment.' 51 So.2d at 1125. The Court also cautioned that 'appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent judgment and impartial findings and conclusions of the trial court.' 51 So.3d at 1124.
"....
"In Ex parte Scott, [[Ms. 1091275, March 28, 2011] - -- So.3d ---- (Ala.2011),] the circuit court adopted verbatim as its order the State's answer to Scott's Rule 32 petition. The Alabama Supreme Court stated:
" '[A]n answer, by its very nature, is adversarial and sets forth one party's position in the litigation. It makes no claim of being an impartial consideration of the facts and law; rather it is a work of advocacy that exhorts one party's perception of the law as it pertains to the relevant facts.'
"- -- So.3d at --- -. The Court then held that '[t]he trial court's verbatim adoption of the State's answer to Scott's Rule 32 petition as its order, by its nature, violates this Court's holding in Ex parte Ingram' that the findings and conclusions in a court's order must be those of the court itself. - -- So.3d at --- -.
"Mashburn argues that his case is similar to Ex parte Scott because, he says, the State's proposed order adopted by the circuit court tracks the language of the State's answer and motion to dismiss and, thus, 'is filled with language adversarial in nature.' "
In the present case, Calhoun does not identify, nor does this Court find, any instance in which the circuit court's order reflects language that is adversarial in nature. Additionally, nothing in the circuit court's order is "patently erroneous" as was the case in Ex parte Ingram.
Calhoun does point out instances in which the circuit court appeared to apply a stricter pleading standard than what is required by Rule 32.3 and 32.6(b), Ala. R.Crim. P. According to Calhoun, the circuit court applied a "piecemeal analysis" of Calhoun's petition and required each individual paragraph to adequately state a claim of ineffective assistance of counsel. Although certain portions of the circuit court's order do state that individual paragraphs of the petition are insufficiently pleaded, the circuit court's ultimate conclusion, i.e., that the issues raised in Calhoun's petition were either meritless or inadequately pleaded, was correct. This Court reviewed Calhoun's petition in its entirety and, for the reasons stated, also found it to be deficiently pleaded. It is well settled that "where the judgment of the circuit court denying a petition for post-conviction relief is correct for any reason, it will be affirmed by this Court, even if the circuit court stated an incorrect reason for its denial." Swicegood v. State, 646 So.2d 159, 160 (Ala.Crim.App.1994).
Because the present case is distinguishable from Ex parte Ingram and *483 Ex parte Scott , Calhoun is due no relief on his claim that the circuit court erred by adopting the State's order.
Conclusion
For the reasons stated above, we conclude that Calhoun failed to adequately plead his ineffective-assistance-of-counsel claims. Accordingly, the circuit court correctly summarily dismissed Calhoun's petition, and its judgment is affirmed.
AFFIRMED.
Windom, P.J., and Joiner, J., concur.
Welch and Kellum, JJ., concur in the result.

Calhoun did not provide Ms. Sims's first name.

Previous testimony indicated that Ms. Garrett referred to Calhoun as "Cody."

"R1" denotes the record on appeal from Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005).